**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LEXINGTON CHAIR COMPANY, Respondent.**

**No. 10000.**

United States Court of Appeals Fourth Circuit.

Argued Nov. 4, 1965.

Decided May 6, 1966.

Allen M. Hutter, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Glen M. Bendixsen, Atty., N. L. R. B., on brief), for petitioner.

R. D. Douglas, Jr., Greensboro, N. C. (Douglas, Ravenel, Josey & Hardy, Greensboro, N. C., on brief), for respondent.

Before SOBELOFF and BRYAN, Circuit Judges, and MICHIE, District Judge.

MICHIE, District Judge.

This case comes before us upon the petition of the National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act (hereinafter referred to as the Act)[1] for enforcement of its order against the Respondent, Lexington Chair Company of Lexington, North Carolina (hereinafter called the Company). The Board's decision and order, issued January 28, 1965, and reported at 150 N.L.R.B. No. 126, arose out of charges that the Company had engaged in unfair labor practices within the meaning of Sections 8(a) (1) and (3) of the Act. The Company is engaged in the business of manufacturing bedroom and dining room furniture and employs over 200 nonsupervisory production and maintenance workers at its Lexington plant.

The Board, which adopted the findings, conclusions and recommendations of the Trial Examiner and made only a minor addition to the Trial Examiner's proposed order, found that the Company had violated the provisions of

1. 29 U.S.C. § 151 et seq. (1964 ed.).

Section 8(a) (1) of the Act by interfering with, restraining and coercing its employees in their exercise of protected activity by posting and enforcing a broad no-solicitation rule; by posting a rule restraining the employees' freedom of expression; by inducing employees to abandon the Union (United Furniture Workers of America, AFL-CIO); and by interrogating them with respect to their union activities. The Board also found that the Company had discharged five employees to discourage union membership and activity in violation of Sections 8(a) (1) and (3) of the Act. We find that substantial evidence on the whole record supports the Board's findings. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The facts involved in the case cover the period of time from the announcement of a Union organizational campaign among the Company's employees in April, 1963, until the discharge of the last of the five employees referred to above on March 24, 1964.

In April the Union apprised the Company that an organizational attempt would be made among the Company's employees. The evidence shows that the Company decided to resist unionization. Thereafter, about the middle of May, John E. Adams, general manager of the Company's plant, convened groups of 15 to 25 employees in the main office of the plant. The employees were shown literature and a picture of the "Sun Glow plant" at Logan, Ohio, a customer of the Company and itself a manufacturer of articles of furniture. Sun Glow had ceased manufacturing operations the month before but had contracted to buy still more furniture from the Company. At the time of the closing of Sun Glow the Union had announced in Ohio that it intended to organize the Lexington plant. In the meetings with the Company's employees Adams and another Company official told the employees that they could expect calls from Union organizers and reminded them of what had happened at Sun Glow. They also stated that the Company had plenty of business and hoped that it would continue and that there was no necessity for a union at Lexington.

The Union began its organizational campaign among the Company's employees in June. Mail and home contacts by a Union representative were followed by personal solicitation by fellow employees, the distribution of literature and periodic meetings attended by 10–15 employees.

The Company meanwhile was at work attempting to discourage unionization. The first of a series of letters deprecating the Union and extolling the virtues of the Company was sent to all employees on October 15. Additional letters were sent out on October 28 and on November 12.

During this same October-November time period an employee antiunion campaign was launched.[2] Its originator was Kenneth Kepley, an inspector in the Company's finishing department, and he and Jack Fritts, a stock clerk in the warehouse, were the most active of the Company's employees in the movement. These two individuals and other employees, sometimes calling themselves "the antiunion committee," engaged in three basic types of activity: procuring signatures of employees to "antiunion petitions" or "pledges" to avoid union entanglements; soliciting voluntary donations to cover the costs of antiunion literature; and distributing antiunion material to employees, usually keyed in time and content to Union leaflet distributions.

Several threats to, and interrogations of, their fellow employees who backed the Union are attributed to members of the antiunion committee. However, the Trial Examiner found that neither Kepley and Fritts nor other members of the committee possessed the necessary badges of

2. The Trial Examiner found that the antiunion campaign was waged continuously at least from October 1963 until the opening of the hearing in this matter before him on June 22, 1964.

authority to be classified as supervisors within the meaning of Section 2(11) of the Act and that these committee members were not agents of the Company in carrying on their fight against unionization. Accordingly, the Company is not responsible for their activities.

The Union campaign progressed through the summer of 1963 and into the fall. On or about November 6 or 7 Maston Turner, a former employee of the Company (Turner's prior dismissal is considered below), presented the Company's personnel manager, Lloyd Carlton, with a list of 14 names of individuals who comprised the Union's organizing committee.[3]

Thereafter, from the Trial Examiner's findings, the Union campaign continued down through at least March, 1964. Numerous allegations of unfair labor practices by the Company in the time period between September, 1963, and March of 1964 were considered by the Trial Examiner. Most of the allegations were rejected by him. We consider each of the acts which the Trial Examiner found constituted unfair labor practices. The Company actions break down into three categories: (1) the unlawful rules, (2) coercion and interrogation of employees and (3) the discharges of five pro-Union workers.

I

Shortly after the "Sun Glow talks" which general manager Adams had delivered in May of 1963 he revived a set of rules and regulations originally posted in the plant around December of 1962. One of these rules prohibited "distributing or posting literature of any kind in the plant." In addition, a new rule was added which prohibited employees from "criticizing Company rules and policies so as to cause confusion or resentment between employees and management." Violation of these rules could subject the offender to disciplinary action, including discharge.

The Board found that the posting of these rules constituted violations of Section 8(a) (1) of the Act, and the Company now admits that the posting of the no-distribution rule was "technically incorrect" under the Act. This rule has now been revised by the Company to apply only to solicitation or distribution on Company time.

■ The posting of these rules constituted clear violations of the Act. The no-solicitation rule applied, on its face, to nonworking hours as well as to working time and it was cited to an employee (Raymond Jarvis, whose subsequent dismissal is considered below) by Company officials in early November, 1963, when the employee was circulating Union literature in the Company's parking lot during his lunch break. The Board found that, due to the Company's hostility towards the Union and the timing of the posting and invocation of the rule, the Company's purpose was to interfere with its employees' right to organize. However, even without this anti-Union animus, the posting of the no-solicitation rule was unlawful. The Board has adopted the presumption that a rule prohibiting union solicitation by an employee outside working hours although on company property is an unreasonable impediment to self-organization in the absence of special circumstances evidencing the necessity of such a rule in order to maintain production and discipline. E. g., Peyton Packing Co., 49 N.L.R.B. 828, 843 (1943). The presumption has been approved by the Supreme Court. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 804, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). No justification for the unlawfully broad scope of the rule in the present case was offered by the Company and we conclude that the Board was correct in declaring the rule unlawful.

---

3. Of the 14 names on the list, three had already been discharged by the Company, four were subsequently discharged, two quit work (one of them on the same day the list was given to the personnel manager), and five remained with the Company (two having had their names crossed off the Union list after it was given to the personnel manager).

The no-criticism rule, the Company asserts, was not intended to prohibit legitimate union activity which might result in advocating higher pay, more fringe benefits or other such changes in working conditions, but rather it was intended to prohibit "carping" and "backbiting", personality attacks on supervisors, untrue statements which might cause confusion, and "similar violation of normal good manners between employees and employer." The record supports the Company's contention that it never enforced the rule along the former lines. Indeed, the Company apparently never enforced the rule at all. Nevertheless, we find that the Board was justified in concluding that the rule constituted an infringement of rights guaranteed employees under Section 8(a) (1) of the Act. The rule was promulgated against a background of expressed hostility to the Union and no rational explanation for its adoption is apparent other than that the Company was attempting to control criticism by pro-Union employees during the organizational struggle which the Company knew would ensue. It is difficult to envision organizational activity by pro-union employees which would not involve criticism of management rules and policies. Organizational campaigns traditionally involve, at the very least, a heavy dosage of harsh language, invective, charges and counter-charges. Campaigns are not carried on with the high level of dignity and restraint characteristic of the judicial process which will decide the propriety of actions taken by union and management months after the battle has ended. Management's desire to avoid the more acrimonious manifestations of conflict which it contends the no-criticism rule was designed to cover is perhaps understandable. But management was not entitled to promulgate a rule so general in its terminology and so broad in its apparent coverage as to inhibit legitimate organizational activity by pro-union employees. To the average employee the rule might well have meant that any criticism of management, resulting in aid to the Union campaign, would bring swift and severe reprisal. "The true meaning of the rule might be the subject of grammatical controversy. However, the employees * * * are not grammarians. The rule is at best ambiguous and the risk of ambiguity must be held against the promulgator of the rule rather than against the employees who are supposed to abide by it." NLRB v. Miller, 341 F.2d 870, 874 (2d Cir. 1965).

## II

The Board concluded that the Company had violated Section 8(a) (1) of the Act by soliciting employees to abandon the Union and by coercively interrogating employees with respect to the organizing and union activity of other employees. The basis for these findings is grounded in two incidents, both occurring on or about November 12, 1963.

The alleged solicitation was conducted by personnel manager and purchasing agent Lloyd Carlton. Shuford Smith, whose name had appeared on the list of Union committee members presented to Carlton on or about November 6 or 7, was asked by anti-union committee leader Kenneth Kepley to go talk to Carlton. Upon Smith's agreement, Kepley ushered him into Carlton's office. Carlton was not present. Kepley went to get Carlton, and the two returned to the office shortly thereafter. Kepley then left and Carlton opened the conversation with Smith, stating that he understood that Smith wanted to talk to him. Smith rejoined that he understood that Carlton wanted to talk to him. Carlton then told Smith just to relax and they would talk. A conversation ensued which the Trial Examiner described as "conducted at a low-tension level." Carlton told Smith that he was surprised to see Smith's name on the Union committee list and that he knew most of the employees who were mixed up in the Union all along but that he didn't know that Smith was. Carlton made no threats nor did he, according to Smith, say anything to put Smith in fear of losing his job because his name was on the list.

On the foregoing facts the Trial Examiner found that a Section 8(a) (1) violation had occurred and the Board concurred. We think the conclusion is supported by substantial evidence. As the Examiner viewed it, Smith went to Carlton's office "at the latter's direct invitation or his ratification of Kepley's invitation" and Carlton then indulged in "fencing" in the hope that Smith would follow the lead of two Union committee members who the Trial Examiner found had removed their names from the Union list shortly prior to this conference. The record amply supports the view that Carlton ratified Kepley's suggestion that Smith go talk to "the man." Smith told Carlton, in effect, that it was not his (Smith's) initiative but Carlton's which had brought the two together in the personnel manager's office. Carlton thereupon launched a conversation dealing with Smith's Union allegiance, albeit on a low key. Given the Company's anti-Union posture, the location and timing of the conversation and the way in which the meeting came about, we think the Trial Examiner was entitled to find that Carlton was soliciting Smith's withdrawal from the Union committee in violation of the Company's duty not to interfere with, restrain or coerce its employees in the exercise of their right to self-organization. The Trial Examiner heard the evidence and observed the demeanor of both Smith and Carlton on the stand and his finding should not be lightly upset.[4] Nor are we unmindful of the fact that two of Smith's fellow Union committee members had, shortly prior to the solicitation in question, requested that their names be removed from the list and that the Company had already discharged three pro-Union employees which the Board has found constituted unfair labor practices. We therefore affirm the Board's findings on this point.

The Company vigorously asserts that the Trial Examiner erred in allowing Smith to testify to the statements and actions of the Kepleys which led up to Smith's meeting with Carlton. It is contended that there is no proper testimony about why Smith came to see Carlton.[5] We think there is some merit to the Company's contentions.

The Examiner found that the Kepleys were not supervisors for whose actions the Company could be held responsible under the Act, nor were they agents of the Company in their anti-Union efforts. Their statements and actions would therefore be irrelevant in determining whether the Company had violated its employees' rights under the Act. The issue involved was whether Carlton had solicited Smith's withdrawal from the Union committee, not whether the Kepleys had done so. It was proper for the Trial Examiner to rely upon the fact that Smith went to Carlton's office at Kepley's invitation, for the evidence indicates that Carlton was aware of that fact. However, there is no evidence that Carlton had any knowledge of the details of Kepley's conversation with Smith or of any of Mrs. Kepley's statements or ac-

---

4. The Hearing Examiner was impressed by Smith's "apparent candor and lack of interest in the outcome." (Smith had been discharged by the Company prior to the hearing and his discharge had been alleged as an unfair labor practice, but his case had been dropped by the General Counsel for reasons personal to Smith.) Carlton was described as a nervous witness who "snapped back" at the questioner on occasion. Carlton's version of the story indicated that all initiative for the meeting came from Smith, but the Examiner credited Smith's version. It is well settled that the credibility of witnesses is to be determined by the Board, not by this court. E. g., NLRB v. Lester Bros., 301

F.2d 62, 68 (4th Cir. 1962) ; NLRB v. School-Timer Frocks, 224 F.2d 336, 337 (4th Cir. 1955).

5. The Company, at the hearing and in its brief, contended that the Trial Examiner violated the hearsay rule. The objection is not properly based upon the hearsay rule, however, for the testimony related to the verbal acts of the Kepleys and was not offered to prove the truth of any assertion made by them. The objection, rather, goes to the relevancy of the testimony, and it is clear that the Trial Examiner so understood it for he consistently ruled the testimony admissible "subject to tie-up with the Company."

tions. We conclude that these details were not properly in evidence.

In our view, however, the Trial Examiner's error was harmless for his finding of an illegal solicitation was based upon the actions of personnel manager Carlton, not upon the actions of the Kepleys. Smith's testimony concerning the actions of the Kepleys was included in the Examiner's findings of fact, but the Examiner's conclusion that Carlton unlawfully solicited Smith to withdraw from the Union is, as indicated above, supported by substantial evidence without the necessity of relying on the statements of the Kepleys or the actions of Mrs. Kepley.

The second incident occurring on or about November 12 and found by the Board to constitute an unfair labor practice was the questioning of an employee, Kenneth Troutman, in the Company's cabinet room by cabinet room foreman Joe Bruff. According to Troutman's credited testimony, he was at his job, getting glue from a glue barrel, when Bruff, his foreman, asked him if employee Raymond Jarvis had been pressuring or bothering him about the Union. Troutman answered in the negative and reaffirmed this upon Bruff's asking him if he was "sure."

On these facts the Trial Examiner found an unlawful interrogation. Unquestionably Bruff's actions constituted interrogation, and there is no dispute over the Examiner's finding that Bruff was a supervisor for whose actions the Company is responsible under the Act. However, it is well settled that not every interrogation of employees by Company officials constitutes coercion within the proscription of the Act; each case must be considered upon its particular facts. Daniel Constr. Co. v. NLRB, 341 F.2d 805, 812 (4th Cir.), cert. denied, 382 U.S.

831, 86 S.Ct. 70, 15 L.Ed.2d 75 (1965) (dictum); NLRB v. Prince Macaroni Mfg. Co., 329 F.2d 803, 806 (1st Cir. 1964).

In a 1963 decision the Second Circuit listed five factors to be considered in determining whether an interrogation meets the standards of an unfair labor practice:

"(1) The background, i. e. is there a history of employer hostility and discrimination?

"(2) The nature of the information sought, e. g., did the interrogator appear to be seeking information on which to base taking action against individual employees?

"(3) The identity of the questioner, i. e. how high is he in the company hierarchy?

"(4) Place and method of interrogation, e. g. was employee called from work to the boss's office? Was there an atmosphere of 'unnatural formality'?

"(5) Truthfulness of the reply." [6]

Examining this list in the light of the instant facts, it appears that the first and second factors tend to support the Board's finding of a violation while the third and fourth factors would indicate an absence of coercion. The Company was certainly hostile to the Union and the Board has found that five employees were discharged for reason of their Union proclivities. Bruff's questions were directed to the activities of a specific employee, Raymond Jarvis, who, as stated above, was thereafter discharged by the Company. However, the questioner was only a foreman in the Company hierarchy and it was his duty to inquire into matters affecting production in his department. The questioning occurred on the job, under informal circumstances. As to the fifth factor, the truthfulness of

---

6. Bourne v. NLRB, 332 F.2d 47, 48 (2d Cir. 1964); accord, NLRB v. Camco, Inc., 340 F.2d 803, 804 (5th Cir.), cert. denied, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965). The list is not intended to be exclusive. One authority has warned that employers are on dangerous ground in interrogating unless they have a valid purpose for establishing the Union's strength and they communicate this purpose to their employees and assure them that no reprisals will be taken. Bok, The Regulation of Campaign Tactics in Representation Elections under the National Labor Relations Act, 78 Harv.L. Rev. 38, 107 (1964).

the reply, the record furnishes no basis for a finding. It is apparent, however, from the brevity of Troutman's replies, that he was not inclined to discuss any of Jarvis' activities with Bruff.

█ Based upon the foregoing considerations, the Board's finding of a violation is not a particularly strong one, and it is somewhat weakened by the fact that this incident constitutes the sole act of alleged interrogation before us. A single question put to a single employee may be a violation, however, if there is a background of union hostility. NLRB v. Camco, Inc., supra, at 805, n. 6 (dictum); see NLRB v. Griggs Equipment, Inc., 307 F.2d 275, 278 (5th Cir. 1962). The Company, in its brief, seeks to justify the questioning on the ground that Bruff was merely assuming the proper role of a supervisor concerned about activities in the plant. This explanation appears to be but a rationalization after the act, however, as Bruff's testimony, which the Trial Examiner did not credit, was a generalized denial that the event ever occurred. There is no evidence before us of a legitimate interest of the Company which would justify the interrogation, nor does it appear that Bruff related it to work matters when he questioned Troutman. Under these circumstances we think the Board properly exercised its primary duty "to determine the significance of particular acts of interrogation in the light of the entire record in the case." Blue Flash Express, Inc., 109 N.L.R.B. 591, 595 (1954). The Board might perhaps just as easily have found the questioning noncoercive, but we do not find the inference of coercion insubstantial. Beyond the substantial evidence standard it is not for this court to substitute its judgment for that of the Board.

### III

The Board found that the Company had discharged employees Lloyd Robinson, Edwin Tollie, Maston Turner, Raymond Jarvis and Kent Owens in order to discourage Union membership and activity, in violation of Section 8(a) (1) and (3) of the Act.

### Robinson and Tollie

Lloyd Robinson and Edwin Tollie were the first of the pro-Union employees to be discharged, on October 2, 1963. Both had been in good standing with the Company vis-a-vis their work up until the time of the discharges, and both had in fact received wage increases in 1963. The two were active early in the Union campaign. Beginning in mid-June of 1963 Robinson had procured seven or eight signatures on bargaining-authorization cards in the cabinet room. Tollie had, during the same period, spoken to fellow employees on behalf of the Union at their homes and in the Company's parking lot and had procured signatures from three cabinet room employees.

On October 2 both men were working in the cabinet room under supervisor and foreman Joe Bruff. When their normal quitting time came they were asked, along with a number of other men in the department, to work overtime. They agreed, but before commencing overtime work they walked off the floor for a smoke-and-coke break. This break, the Examiner found, was an habitual practice for employees in the cabinet room when they were asked to work overtime.

As Robinson and Tollie were leaving the floor two other employees, Bruce Brookshire and Howard Bates, who were also heading out for a break, were called back at the direction of assistant superintendent George Baity. Baity told Bruff that he wanted Brookshire and Bates to work with him. Bruff dispatched James Helpler to bring back Brookshire and Bates, and Tollie heard Helpler tell Brookshire to go back to work—that he could take a smoke break later.

Robinson and Tollie proceeded out of the plant door and lit cigarettes. Robinson then noticed that plant superintendent Hughes Ward had come to the plant exit and was looking at them. The two suspected a "frame." They decided to go back and punch out instead of going

back to work, in the hope of avoiding the discharges they expected. However, when they re-entered the plant they were called over by Bruff and told that they had been discharged for smoking away from the job. When Tollie protested that Bruff had told them they could take breaks under these circumstances, Bruff replied that it was plant superintendent Ward's decision.

That evening Tollie visited Bruff at the latter's home. In the course of the conversation Bruff suggested that perhaps the smoking incident was being used as an excuse to get rid of Tollie and Robinson and asked if they had been doing anything of which Bruff was unaware. Bruff suggested that Tollie go to the plant the next day and talk to Ward and that if Tollie told "everything" he might get his job back. When asked what he meant, Bruff replied "you know better than that." Tollie suggested that he might request a hearing and Bruff retorted that he would "have to lie for the Company."

The following day Robinson and Tollie went to the plant to talk to Ward. They asked how they could be discharged for smoking when Bruff had given them permission. Ward replied that Bruff had no authority to do so and that he (Ward) could fire them for smoking. Tollie indicated he would get a hearing and produce witnesses that permission to smoke had been given. Ward swore and indicated he could get six witnesses for every one of Tollie's.

 We think the Board's finding that Robinson and Tollie were discharged in order to discourage unionization is entitled to affirmance. The finding of the Trial Examiner is supported by circumstances from which the conclusion of discriminatory discharge may legitimately be drawn and is binding on this court. We may not substitute our judgment for that of the Board. NLRB v. Overnite Transp. Co., 308 F.2d 279, 281–282 (4th Cir. 1962); Northern Virginia Steel Corp. v. NLRB, 300 F.2d 168, 174 (4th Cir. 1962); NLRB v. Spartanburg Sportswear Co., 246 F.2d 366, 367

(4th Cir. 1957). Moreover, it appears quite clear that the Company never enforced a no-smoking rule under the circumstances presented here prior to the instant discharges. The sudden assertion of previously unenforced management rules, coinciding with a union campaign, has previously been held by this court to be an unfair labor practice where violation would not have endangered plant security or otherwise seriously affected operations, although the rules were reasonable in and of themselves. NLRB v. Lester Bros., 301 F.2d 62, 67 (4th Cir. 1962). The sudden assertion of the no-smoking rule in the instant case provided a convenient mode of eliminating two Union adherents, and the Examiner was entitled to find, as he did, that Ward and Baity, knowing of the smoking custom, set up a situation where Robinson and Tollie, and only these two, would be vulnerable to a charge of being away from the job.

 The Company asserts the defense that the Board has not proved the Company knew of Robinson's and Tollie's Union activities. Unquestionably, knowledge by the Company of a dischargee's union membership is a prerequisite to a finding that the discharge was made for that reason and the Board has the burden of proving this knowledge beyond mere suspicion or surmise. NLRB v. Shen-Valley Meat Packers, Inc., 211 F.2d 289, 292 (4th Cir. 1954). But this proof may, of course, be based upon circumstantial evidence. NLRB v. Link-Belt Co., 311 U.S. 584, 602, 61 S.Ct. 358, 85 L.Ed. 368 (1941); NLRB v. Schill Steel Products, Inc., 340 F.2d 568, 572 (5th Cir. 1965); see Hickory Chair Mfg. Co. v. NLRB, 131 F.2d 849, 850 (4th Cir. 1942). Here, as set forth above, the two dischargees had been openly active in soliciting Union support. The Company was actively campaigning against the Union among its employees and in the series of letters hereinbefore referred to boasted that employees, feeling "close" to the Company, were coming forward to inform management of Union activities. One of the letters also stated that some of the

employees who had signed Union authorization cards had discussed the meaning of the cards with Company personnel. Further, Joe Bruff indicated to Tollie that if he went to Ward and told him "everything" he might get his job back. Finally, personnel manager Carlton, in his solicitation of Shuford Smith, stated that he had known all along the names of most of the employees "mixed up with the Union." On the basis of the foregoing the Company is not entitled to a reversal of the Board's order for failure to provide substantial evidence of the Company's knowledge of the dischargees' Union status.

### Maston Turner

Maston Turner was discharged by the Company on October 23 or 24, ostensibly for leaving work without permission and without punching out on the Company's time-clock. Turner was hired by the Company in July of 1963 for work in the packing and shipping department. In September he became active on behalf of the Union, accompanying a Union organizer to 20 or 30 employee homes. After the discharge of Edwin Tollie, Turner accompanied Tollie to another 20 or 30 homes.

On October 22 plant superintendent Ward took Turner and co-employee Harold Myers to the "rough-end" or "mill-end" section of the machine room, and turned them over to supervisor and foreman Ted Wallace to work there. Also present was Gilmer Crotts, who had only recently returned to work and who was being trained by Wallace to replace him on the day shift. Crotts was not introduced to Turner. Turner and Myers worked an 8-hour day and left. Although about two-thirds of the rough-end men worked an hour overtime, Turner and Myers had not been told they were to do so. They went to punch out at their timeclock in the shipping room but found it locked and went home without punching out.[7] The failure to punch out was explained to Jack Fritts, their regular crew leader, the following day, and they were told to report again to the rough-end section. After reporting to rough-end, the two learned that the department was to work overtime that day. Turner asked Wallace for permission not to work overtime as Turner and Myers had made plans to look for a stove for Turner that afternoon. Wallace told him that he and Myers could go as far as he was concerned. The request was later repeated and Turner and Myers were told to go ahead.

At the end of the 8-hour day the two left, again without punching out. Shortly thereafter this was reported to Gilmer Crotts, who pulled Turner's card and took it to plant superintendent Ward. The decision was made to discharge Turner.

The following day Turner was ill, and his wife reported to the plant that he would not be in. He was still sick a day later but went by the plant to pick up his paycheck on the way home from a visit to his doctor. He then learned of the discharge. When Turner confronted Ward and protested that Wallace had given him permission to leave, Wallace was called in and denied giving the permission. Wallace stated he had told Turner that only Crotts could let Turner off, as Crotts had replaced Wallace as foreman. The Company now contends that this was the case and that Turner simply walked off the job without reporting to foreman Crotts as he knew he was required to do.

The Trial Examiner credited Turner's version of the story supported by Myers' testimony. He found that Wallace was at least a co-supervisor with Crotts, and the fact that Crotts had only recently returned to work and was being "broken in" by Wallace supports the finding. Turner and Myers were "turned over" to Wallace, not Crotts, and took their

7. The Trial Examiner found that the rack containing employees' timecards was kept locked except for a few minutes at punching-out time. The shipping room was working an hour overtime on the day in question, hence Turner and Myers were unable to punch out.

orders from Wallace. The record supports this finding, and we defer to the Examiner's crediting the testimony of Turner and Myers that they asked for, and received, permission from Wallace to leave. Thereafter Turner was fired; Myers was not. Turner was a Union supporter; Myers was not. The only difference in their actions was that Myers reported to work on the day that Turner was ill. The illness of Turner was properly reported to the Company, but he had apparently already been discharged. On this evidence the Board could properly find Turner was discharged for his Union activities, not for leaving without permission and failing to punch out.

The Company asserts the same defense in the case of Turner as in that of Robinson and Tollie: the failure to show that the Company was aware of Turner's Union activities. We reject it on the same basis. In addition, the Trial Examiner relied upon an incident occurring in mid-September to show Company knowledge of Turner's Union support. Turner was at work when general manager Adams, personnel manager Carlton and plant superintendent Ward walked by. Ward, speaking to Adams, stated "there goes one, John, they call him Turner." We agree with the Examiner that the absence of an explanation for this by Adams, Carlton and Ward at the hearing justifies the inference that they were speaking of Turner's Union alliance.

*Raymond Jarvis*

Raymond Jarvis was discharged on November 15, 1963, for "making bad beds." Jarvis had backed the Union up until the time of his discharge. As noted hereinbefore Jarvis had been approached by general manager Adams and personnel manager Carlton on November 6 or 7 while he was distributing Union pamphlets in the Company parking lot and they had cited the no-distribution rule to him. Immediately after this confrontation the Trial Examiner found that Joe Bruff, Jarvis' foreman, began

to "make it hard" on Jarvis. Bruff shifted Jarvis from job to job (although this was apparently not an uncommon occurrence in the plant), watched him and tried to find fault with his work. Jarvis was given no assistance when he fell behind with his work and was given jobs with which he had little or no experience. As hereinbefore discussed, Bruff also asked another employee if Jarvis was "pestering" or "bothering" him about the Union.

On the date of his discharge Jarvis was assigned to a "bed-clamp" job which he had performed for the preceding "few days." About an hour later (approximately 8 a.m.) he was moved, over his protests that he knew nothing about the job, to assembling headboards for beds. On this new job, Jarvis testified, he worked slowly and continually asked June Worley, Jarvis' regular "boss" who had suffered a heart attack and was merely visiting the plant that day, if he was assembling correctly. Jarvis stated that he continually checked with Worley because he (Jarvis) knew that Bruff was "out to get" him. Worley assured him he was assembling properly. Jarvis further testified that he assembled no more than 15-20 headboards in 1½ hours. At the end of that time period Bruff came and accused him of unsatisfactory work. Upon looking at several headboards which had been rejected by inspector Paul Long, Jarvis stated it was not his work. Bruff thereupon discharged Jarvis.

Inspector Long testified that 20 bad headboards came to him in a group of 30 at approximately 7:15 a. m. Relying on this, the Trial Examiner found that Jarvis could not have done the bad work, even if Long had received the first load later than he thought and even if Jarvis had worked on the bed-clamp job for a shorter period of time than he stated before switching over to assembling headboards.

There appears to be a substantial discrepancy between the estimates by Long and Jarvis as to the time when Jarvis was confronted with the bad work. Jar-

vis' timetable would make it about 9:30 a. m., while Long's would make it sooner. The Company complains that the Trial Examiner relied partly upon Long's estimate and partly (inconsistently) upon Jarvis'. The Examiner, however, allowed in part for the inconsistencies in time estimates and the stories are not inconsistent on the point that the first bad work reached Long before Jarvis began assembling. We find nothing incredible in the Examiner's findings as to the time elements involved. Nor do we think the Company's argument that Jarvis did not protest that he could not have done the bad work because he had not had time is entitled to serious consideration at this level. That was a circumstance to be considered with all the others by the Examiner and Board. Given the entire background, including the attention which Bruff and other Company officials had paid to Jarvis since he became involved with the Union, we find that the Board was entitled to find the alleged reason for Jarvis' discharge was only a pretext.[8]

### Kent Owens

Kent Owens, an employee in the shipping department, was laid off on March 24, 1964, in a general Company cutback of 10 men. Two men were laid off in the shipping department.[9] The Examiner found that the Company had legitimate economic reasons for the cutback. Nevertheless, he found that the inclusion of Owens as one of the two employees laid off from the shipping department was motivated by anti-Union considerations. No evidence was offered by the Company to support its alleged reasons for Owens' selection—that he was a new man, constantly quarreling, arguing and voicing objections to assignments. The Examiner relies upon evidence establishing that, prior to his separation from the Company, Owens had been the target of anti-Union committeemen Jack Fritts and Kenneth Kepley.[10] Fritts and Kepley solicited Owens, along with Union committee members Shuford Smith and Louis Llanza, to desert the Union and become members of a "grievance committee" which would take the place of a union. Owens was specifically warned by Fritts one week before his separation from the Company that he (Fritts) was giving Owens one more chance to get out of the Union before he started stepping on toes. "We can't let you three boys hold us up like you are doing." Owens retorted that he was "tired of being pushed around in the furniture

8. There is no question of the Company's knowledge of the Union inclinations of Jarvis and Kent Owens, next considered. In addition to the parking lot and interrogation incidents relating to Jarvis, both men's names were on the Union committee list given to personnel manager Carlton on or about November 6 or 7.

9. In addition to Owens, employee Jerry Shaw was laid off from the shipping department. A complaint relating to Shaw was rejected by the Trial Examiner on the ground that the Company had a legitimate reason for discharging Shaw on the basis of his absentee record. Also discharged on the same date were Shuford Smith and Louis Llanza, whose names had appeared on the Union list. Their discharges, however, are not in issue here. As to Smith, see n. 4 above.

10. In contrast to the situation presented in personnel manager Carlton's solicitation of Shuford Smith previously considered, we think the Trial Examiner was entitled to rely on the statements and actions of Kepley and Fritts in this instance as proof upon which to infer that Owens was laid off for his support of the Union. Regardless of the Examiner's finding that Kepley and Fritts were not agents of the Company, we think the coincidence of time between the solicitation of Owens, Smith and Llanza and Fritts' threat to Owens, Ward's talk with Owens (considered below) in which he indicated his knowledge of some of the activities of Fritts and Kepley, and the subsequent separation from the Company of Owens, Smith and Llanza creates a strong presumption that the utterances of the anti-Union committeemen represented not only their own feelings but those of the Company as well. On this basis, and in view of the previous discharges and the Company's overall anti-Union position, we find that the evidence of the solicitations and threats by Kepley and Fritts is sufficiently tied in with the Company.

factories and seeing other people pushed around" and that the Union was the only way he knew how to stop it.

During the same time period that the offer of a "grievance committee" was made Owens was approached by plant superintendent Ward who took Owens around the corner "behind the office." Ward told Owens that he had heard that Owens had made some remarks about him relative to Ward's cutting out the smoking break in the shipping department. Owens conceded that he had. A conversation ensued concerning the right of employees to smoke and the discharge of Robinson and Tollie for taking a smoking break. During the course of the conversation Ward inquired if Kepley and Fritts had made any "promises" to Owens.

 It is, of course, well settled that union activity is no bar to a discharge, for "the right to hire and fire for sound business reasons is still a managerial prerogative." NLRB v. Williams, 195 F.2d 669, 672 (4th Cir.), cert. denied, 344 U.S. 834, 73 S.Ct. 42, 97 L.Ed. 649 (1952). But if discouragement of union membership is a substantial, motivating reason for a layoff, the existence of an alternate ground of justification is no defense. "The charge is sufficiently established if, in addition to an economic ground shown in the Labor Board hearing, there is proof from which the examiner may fairly find * * * that the layoffs were motivated by a purpose to interfere with union organizational activities." NLRB v. Associated Naval Architects, Inc., 355 F.2d 788, 792 (4th Cir. 1966). We find this to be such a situation.

### IV

The Board's order requires the Company to cease and desist from its unfair practices, including maintaining the no-distribution rule and the no-criticism rule (to the extent the Company has not already remedied the latter situation), soliciting employees' withdrawal from the Union, interrogating employees with reference to the activities of other employees, and discriminating with reference to hiring, tenure or other conditions of employment. The Company is also required to reinstate the five individuals whom it discriminatorily discharged without loss of seniority rights or other privileges and to make them whole for any loss of earnings suffered in the interim and to post the usual notices in its plant that the Company will comply with the order. We find the Board's order proper to redress the injuries suffered in this matter.

Accordingly, the order will be Enforced.