529 F.2d 1225
 92 L.R.R.M. (BNA) 2040, 78 Lab.Cas. P 11,384
 FLORIDA STEEL CORPORATION, Petitioner-Cross Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.
UNITED STEELWORKERS OF AMERICA, AFL-CIO, Petitioner-Cross Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.
 Nos. 74--3983, 74--4201.
 United States Court of Appeals,
Fifth Circuit.
 April 12, 1976.
 
 David A. Lang, New Orleans, La., Charles F. Henley, Jr., Jacksonville, Fla., for Florida Steel Corp.
 Elliott Moore, Deputy Associate Gen. Counsel, John H. Ferguson, Douglas S. McDowell, Attys., N.L.R.B., Washington, D.C., Harold A. Boire, Regional Director, Region 12, N.L.R.B., Tampa, Fla., Peter G. Nash, N.L.R.B., Washington, D.C., for N.L.R.B.
 Dennis D. Clark, Washington, D.C., for United Steelworkers, etc.
 Petitions for Review and Cross Applications for Enforcement of an Order of the National Labor Relations Board. (Florida Cases).
 Before GEWIN, GOLDBERG and DYER, Circuit Judges.
 GEWIN, Circuit Judge:
 
 
 1
 The National Labor Relations Board determined that Florida Steel Corporation (the Company) had violated the National Labor Relations Act, as amended, 29 U.S.C. § 151 et seq. in several respects. It found that during an organizational campaign the Company violated § 8(a)(1) of the Act[1] by maintaining and enforcing an invalid no-solicitation rule; interrogating employees with regard to their union[2] membership and activities; and harassing known union supporters through extensive surveillance. Concluding that the Company's stated reasons for the discharges of employees Martin, Purscell, and Blessing were pretextual and that the real reason for the discharges of these men was their union activity, the Board found that these discharges constituted violations of § 8(a)(3)[3] and (1) of the Act. On the other hand, the Board concluded that the discharge of employee Sullivan was supported by good cause and not violative of the Act. The remedial order, in addition to cease and desist provisions, called affirmatively for rescission of the invalid no-solicitation rule and for reinstatement of the three illegally discharged employees to their former positions with reimbursement for any earnings lost because of the discrimination against them.
 
 
 2
 Whese two cases[4] present the familiar question whether the Board's findings of fact, on which the various aspects of its order are predicated, are supported by substantial evidence when the record is considered as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Our examination of the record convinces us that with one exception the requisite evidentiary basis for the Board's order was present; that exception concerns Blessing's discharge, which we find to have been supported by good cause. Insofar as the Board's order requires reinstatement and back pay for Blessing, enforcement is denied; in all other respects enforcement is granted.
 
 
 3
 The facts involved in these cases cover the period of time from commencement of a union organizational campaign among the Company's employees in mid-April 1973 until the discharge of the last of the four employees referred to above on July 24, 1973. The facts will be stated in conjunction with the specific alleged violations.
 
 I. Section 8(a)(1) violations
 A. Coercive Interrogation
 
 4
 On April 17, 1973 several Company employees attended a union meeting at a Holiday Inn. At this meeting the employees signed membership cards and agreed to act as voluntary organizers for the union. Gerald Cone, Richard Purscell, and James Sullivan were among the employees attending this meeting. The very next day Cone was approached by his foreman, who asked Cone whether he 'knew anything about this union coming in.' Although Cone had signed a union card at the meeting, he chose to evade the question and responded that he was too preoccupied with personal problems to worry about the union.
 
 
 5
 On April 19 employee Sullivan was similarly approached by supervisor Stuart Shook. Shook asked Sullivan whether he was for the 'union bit,' and the employee replied that he favored the union. Shook responded that if that was what Sullivan wanted, he should 'go get it'; then he walked away.
 
 
 6
 Employee Purscell informed loading foreman Walter Hunziker on May 16 that he was a voluntary organizer for the union.[5] For the next two days Purscell and two other union organizers were subjected to unprecedented observation by high ranking Company officials. On May 18 Hunziker suspended Purscell for one day; the employee was given a warning letter that stated that he had been observed improperly driving a forklift three days earlier on May 15. Significantly, no one had said anything whatsoever to Purscell about the infraction at the time of its occurrence; it was only after he disclosed his union activity that any mention was made of the incident.
 
 
 7
 Several days later Hunziker told Purscell that rebar plant superintendent William Allen wanted to see him in his office. Allen told Purscell that he wanted to find out whether Purscell was really a voluntary organizer or whether someone else had induced him to work for the union. When Purscell replied that he was a volunteer, Allen indicated that he was 'shocked' that Purscell had 'turned against the Company' after having received two or three raises and a recent promotion. He added that he suspected other employees of being union adherents, but not Purscell.
 
 
 8
 The Administrative Law Judge found that none of these instances of interrogation constituted a § 8(a)(1) violation. He reasoned that the interrogation of Purscell could not have had a coercive effect because Purscell had previously voluntarily revealed his union affiliation to a company foreman. With respect to Cone and Sullivan, the Administrative Law Judge concluded that 'such isolated interrogation in a campaign marked by an apparent general willingness of employees to identify themselves openly for the Union cannot suffice . . . to support a Section 8(a)(1) finding.' Disagreeing with the conclusions of the Administrative Law Judge, the Board found that these instances of interrogation were violative of § 8(a)(1). The Board concluded that the purpose and effect of the interrogation of Purscell was to intimidate him in his pursuit of protected union activity. As to Cone and Sullivan, the Board found that the sole purpose for questioning these men was to find out the extent of union support among employees following the first employee union meeting of April 17 and that this interrogation was coercive in nature.
 
 
 9
 In determining whether the Company's interrogation of these men was unlawfully coercive, several factors should be considered: (1) the history of the Company's attitude toward its employees; (2) the type of information sought; (3) the rank of the interrogator in the Company hierarchy; (4) the place and manner of the interrogation; and (5) the truthfulness of the employee's responses. NLRB v. Varo, Inc., 425 F.2d 293, 298 (5th Cir. 1970); NLRB v. Camco, Inc., 340 F.2d 803, 804 (5th Cir. 1965); cert. denied, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965); Bourne v. NLRB, 332 F.2d 47, 48 (2d Cir. 1964). In addition, we may consider such factors as: (1) whether the Company had a valid purpose in obtaining information concerning the union's strength; (2) whether the Company communicated this purpose to the employees; and (3) whether the Company assured the employees that no reprisals would be taken. NLRB v. Varo, supra; NLRB v. Camco, Inc., supra.
 
 
 10
 Sullivan and Cone were questioned almost immediately following the first organizational meeting. The purpose of the interrogations was never explained; nor were the employees given any assurances against retaliation. Cone was obviously discomfited by his supervisor's questions; he purposely avoided disclosing the fact that he had already signed a union card and feigned disinterest in the organizational campaign.
 
 
 11
 The questioning of Purscell was conducted by, and in the office of, the plant superintendent. The purpose of Allen's interrogation was never explained to Purscell; nor was he assured that reprisals would not be taken. To the contrary, as the interrogation followed close on the heels of a somewhat suspect one-day suspension and unprecedented observation of known union adherents by high Company officials, Purscell might well have felt coerced. Moreover, Purscell's own testimony indicates that he did in fact feel intimidated by the Allen interview. Purscell testified that when Allen insisted that there were no problems in the plant, that the employees were all satisfied, and that there was no need for the union, 'I told him that maybe I should talk to more people.' We hold that fair inferences and substantial evidence compel affirmance of the Board's finding that the Company's interrogation of these three employees violated Section 8(a)(1) of the Act.
 
 B. The No-Solicitation Rule
 
 12
 Since 1968 the Company had maintained the following no-solicitation rule:
 
 
 13
 No person will be allowed to carry on union organizing activities on the job. Anyone who does so and thereby neglects his own work or interferes with the work of others will be subject to discharge. Solicitation for membership, pledges, subscriptions, or the unauthorized collection of money, or circulation of petitions or conducting any outside business on the Company's time without permission of the Manager is prohibited.
 
 
 14
 On May 21 employee James Sullivan, a crane operator, was in the melt shop waiting for his crane to be repaired. Two transportation mechanics, waiting to repair Sullivan's crane, but unable to begin work until completion of some preliminary work by maintenance employees, were also present. During this hiatus, Sullivan asked the two men how they felt about the union. The men replied that they would join the union if the organizational campaign succeeded. This was the entire extent of the conversation. Later that morning General Foreman James Hastings summoned Sullivan to his office and gave him the following written reprimand:
 
 
 15
 On May 21, 1973, you were soliciting employees during their working time. This is prohibited. Further violations of company rules will result in further disciplinary action up to and including discharge.
 
 
 16
 This was the first time the rule had been invoked. After receiving his reprimand, Sullivan checked the bulletin boards, but the rule he had allegedly violated was not posted. It was not until one or two weeks after Sullivan's reprimand that the Company finally posted the rule.
 
 
 17
 Contrary to the finding of the Administrative Law Judge, the Board found that the no-solicitation rule was overly broad and was also unlawfully applied to employee Sullivan, both in violation of § 8(a)(1). We agree.
 
 
 18
 In the absence of special circumstances, a no-solicitation rule applicable to employees during their non-working time is an unlawful interference with their right to discuss self-organization among themselves. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); NLRB v. Varo, Inc., supra; Mason & Hanger-Silas Mason Co. v. NLRB,405 F.2d 1 (5th Cir. 1968); NLRB, v. Whitfield Pickle Co., 374 F.2d 576 (5th Cir. 1967); NLRB v. Walton Mfg. Co., 289 F.2d 177 (5th Cir. 1961).
 
 
 19
 . . . (T)ime outside working hours, whether before or after work, or during luncheon or rest period, is an employee's time to use as he wishes without unreasonable restraint, although the employee is on company property. It is therefore not within the province of an employer to promulgate and enforce a rule prohibiting union solicitation by an employee outside of working hours . . ..
 
 
 20
 Peyton Packing Co., 49 NLRB 828 at 843, quoted with approval by the Supreme Court in Republic Aviation Corp. v. NLRB, supra, 324 U.S. at 803, 804 n. 10, 65 S.Ct. at 988, n. 10, 89 L.Ed. at 1379, 1380, n. 10.
 
 
 21
 We are confronted with a rule barring solicitation 'on the Company's time.' In Campbell Soup Co. v. NLRB, 380 F.2d 372 (5th Cir. 1967), we held invalid for vagueness and indefiniteness a ban on soliciation during 'Company working hours.' A prohibition against solicitation during 'paid working hours' has also been held to be overly broad and violative of § 8(a)(1). NLRB v. Daylin, Inc., Discount Division, 496 F.2d 484 (6th Cir. 1974). See also Exide Alkaline Battery Division of ESB, Inc. v. NLRB, 423 F.2d 663 (4th Cir. 1970), holding unlawful a proscription against soliciting during 'working hours.'
 
 
 22
 The average Florida Steel employee--through whose eyes the validity of the no-solicitation rule is measured, Fasco Industries, Inc. v. NLRB,412 F.2d 589 (4th Cir. 1969); NLRB v. Lexington Chair Co., 361 F.2d 283 (4th Cir. 1966)--could easily interpret a prohibition of solicitation 'on the company's time' as barring solicitation during the entire time the employee was 'clocked in', including such non-working times as rest periods and coffee breaks. Indeed, in the aftermath of Sullivan's reprimand for soliciting during a break in work, it is not only possible, but highly likely, that the employees did so construe the rule. At best, the rule is ambiguous, 'and the risk of ambiguity must be held against the promulgator of the rule rather than against the employees who are supposed to abide by it.' NLRB v. Miller, 341 F.2d 870, 874 (2d Cir. 1965); NLRB v. Lexington Chair Co., supra, 361 F.2d at 287; James H. Matthews & Co. v. NLRB, 354 F.2d 432, 441 (8th Cir. 1965), cert. denied 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966). Substantial evidence supports the Board's finding that the Company's no-solicitation rule was overly broad and violative of § 8(a)(1).
 
 
 23
 The reprimand received by Sullivan illustrates the potential for employer abuse inherent in a no-soliciation rule of uncertain breadth and meaning. See NLRB v. WKRG--TV, Inc., 470 F.2d 1302, 1309 (5th Cir. 1973). As the Board pointed out, the conversation which formed the basis of Sullivan's reprimand cannot even be cnaracterized properly as solication. Moreover, although the conversation took place in a work area, it was of only a moment's duration and the employees involved were neither working nor expected to be working. There was no evidence demonstrating that the conversation resulted in or had the potential for disruption. See NLRB v. Mueller Brass Co., 501 F.2d 680 (5th Cir. 1974). Accordingly, the Board's finding that the Company violated § 8(a)(1) of the Act by reprimanding Sullivan for violating the no-solicitation rule is supported by substantial evidence.
 
 C. Excessive Surveillance
 
 24
 On the evening of May 16 rebar shop employees Michael Martin, John Clemens, and Richard Purscell informed their superiors that they had volunteered to serve as union organizers. Informed by telephone of this development, rebar plant superintendent William Allen returned from his home to the plant, where he discussed the situation with the foreman on duty until 11:30 p.m. Allen returned early the next morning and contacted his superiors, production manager George Kampouris, division manager Thomas Creed, and general manager Donald Haney. These three high ranking Company officials came from their offices located a block away to the rebar shop. For two days they spent considerable time in the rebar shop closely observing Purscell, Clemens, and Martin. In the past the employees had seen Kampouris and Haney in the rebar shop only on very rare occasions; they had never seen Creed there before. Purscell testified that at one point Kampouris watched him and nobody else for a four-hour stretch. The supervisors even used the employee lunch room, contrary to normal practice. The reasons for this intense and constant observation were never explained to the employees.
 
 
 25
 The Administrative Law Judge concluded that this 'unprecedented vigil' was not violative of § 8(a)(1) because only the employees' work, not their union activities, was being observed. The Board found otherwise, concluding that the constant and prolonged policing of the employees' work-related conduct had the purpose and effect of harassing and intimidating the employees because of their union activity in violation of § 8(a)(1) of the Act. We approve the Board's conclusion.
 
 
 26
 The timing of this intense and unprecedented surveillance indicates that it was prompted by the employees' revelations of their union involvement. The Company never provided the employees observed with an explanation for the unusual surveillance; nor has it advanced any plausible reason in the course of these proceedings. The employees could well have assumed that the Company was looking for a pretext to discharge them. One union adherent, Cone, had already been discharged; also, Cone and Sullivan had previously been subjected to interrogation about their support for the union. When considered in this time and setting, it appears that the surveillance was reasonably likely to interfere with and restrain the employees in their right to self-organization under Section 7 of the Act, and that the Company's conduct violated § 8(a)(1).
 
 III. The Section 8(a)(3) violations
 A. Discharge of William C. Martin
 
 27
 Two days after informing his foreman of his role as a union organizer, William Martin was summoned to the office of division manager Robert Bodeman. Bodeman accused Martin of threatening employees with loss of their jobs unless they supported the union. Martin denied making such threats and sought to learn the identity of his accusers; Bodeman refused to provide him with this information. Bodeman suspended Martin from work for three days for violation of the no-solicitation rule, pending further investigation of the alleged threats. Martin was ordered to return to work on July 3 to determine final disposition of the matter.
 
 
 28
 On July 3 Martin reported to the office of rolling mill superintendent Campbell. Campbell terminated him. He told Martin that he was being discharged for threatening the security of the people at work and for violating the Company's no-solicitation rule. Martin consistently denied having threatened anyone and repeatedly requested Campbell to tell him the names of his accusers. Campbell refused. Martin renewed this request to Bodeman. Bodeman said he did not know whether he could divulge those names and told Martin to call him in two days. On cross-examination Bodeman admitted that one of the reasons for Martin's discharge was his violation of the no-solicitation rule which we have heretofore found invalid.
 
 
 29
 The Board found that the Company's alleged reason for dismissing Martin was pretextual and that he had been discharged for his union activity. Substantial evidence supports this finding. Martin had an unblemished seven-year work record. The Company continually refused Martin's requests for the names of his accusers and never offered any evidence that Martin ever solicited other employees or that he made any remarks which resulted in the impairment of production or discipline. Moreover, when Campbell fired Martin, one of the things for which he reprimanded him was 'talking union.' From these facts the Board could reasonably infer that Martin was discharged for engaging in protected Section 7 activities.
 
 B. Discharge of Richard Purscell
 
 30
 Richard Purscell disclosed his union involvement to his superiors on May 16. For two days thereafter he and two other union organizers were closely observed by high Company officials. On May 18 he was suspended for one day and given a warning letter for having driven a forklift at too high a speed on May 15. No one had mentioned the forklift incident to him at the time. Purscell was also interrogated by rebar plant manager Allen regarding the union.
 
 
 31
 On May 21 Purscell was excused in the middle of his shift because of illness. The following day he called Allen's office and spoke to Allen's secretary. He told her that he was still sick and would be absent from work. He was told that was 'all right', yet when he returned to work the next day Foreman Hunziker gave him a written warning for having been absent without a doctor's excuse. In March Purscell had likewise returned to work after an illness without a doctor's excuse, but he was not given a reprimand at that time. Forceman Hunziker admittedly had the discretion to waive the doctor's excuse requirement; he had done so in the past with respect to Purscell. This time, however, he chose not to exercise his discretion in Purscell's favor.
 
 
 32
 On June 6 Purscell was orally reprimanded by Hunziker for riding on the running board of a yard tractor. Purscell testified that he and other employees had ridden on the running board in the past without criticism. Hunziker denied this.
 
 
 33
 On June 8 Purscell received another warning for an accident in which he damaged a tractor; according to the Company this accident was the 'main reason' for Purscell's discharge on June 11. In May Purscell had begun to take training to use the yard tractors to 'spot' trailers where needed in the yard. He was to substitute for Joe Sanders, the regular trailer 'spotter', when Sanders went on vacation about June 11. To train for this job Purscell rode with Sanders for about a week; then for about two weeks Purscell drove and Sanders rode along. Purscell also practiced spotting trailers by himself in a special area. On Friday, June 8, Purscell and a fellow employee were working in the yard and found it necessary to move a trailer. Unable to locate Sanders, Purscell decided to move the trailer himself. As he was moving the trailer, its rear end caught and bent the headboard of another trailer.
 
 
 34
 Purscell showed Hunziker the damage, and the foreman told him to go back to work. Shortly thereafter, Purscell was summoned to Allen's office; there he was shown a disciplinary report concerning the accident and told to report back to work on Monday morning. When Purscell arrived on Monday, June 11, Allen read him a termination notice. Before the union campaign another employee had engaged in admittedly negligent conduct resulting in an accident more serious than the one in which Purscell was involved. No disciplinary action was taken. Sanders, the regular trailer 'spotter' had also been involved in serveral accidents without being disciplined.
 
 
 35
 The Administrative Law Judge found that Purscell was lawfully discharged because of his involvement in four separate disciplinary incidents. Substantial evidence supports the Board's contrary finding that the Company merely seized upon these incidents as pretexts to mask the real reason for Purscell's discharge, his union activity. Shortly before he revealed his union involvement Purscell had received a promotion; he had also received several raises. The Company would have us believe that there was a drastic decline in Purscell's work performance which resulted in four disciplinary warnings and warranted his discharge. Coincidentally, that decline occurred during the month after Purscell made known his union involvement. The record does not support such an inference. To the contrary, from the record it appears that from the time he announced that he was a union organizer until his subsequent discharge, Purscell was singled out for special observation, interrogation and harassment. The Company's sudden change in attitude toward Purscell, its apparent eagerness to find fault with him, and the disparate treatment accored Purscell all support the Board's conclusion that he was discharged because of his union support.
 
 C. Discharge of Henry Blessing
 
 36
 Henry Blessing informed general foreman Hastings that he was a voluntary organizer for the union on May 23. Five days later, while passing Blessing's work area, foreman Stuart Shook stopped and told the employee to sweep up the area. Several hours later Shook returned. Observing that the area in question was not yet clean, he again told Blessing to sweep the floor. Drawing back his left fist as if to strike Shook, Blessing angrily responded, 'God damn it, quit pushing so hard. Back up a little.' Shook told Blessing that he would not allow him to 'cuss' and told him either to do his job or 'hit the clock.' Blessing then swept the floor.
 
 
 37
 Shook, who testified that he did not consider the incident 'that serious', did not report it to his superiors. Another foreman, however, did inform general foreman Hastings about the incident. Hastings summoned Blessing to his office. He told the employee that he had heard about his cursing and threatening Shook, that such behavior would not be tolerated, and that he should report back the next day for disciplinary action. The next day he was fired. He was told that if he 'got away' with such behavior everyone else would expect similar treatment.
 
 
 38
 Reversing the Administrative Law Judge, the Board, with one member dissenting, found that Blessing's discharge violated § 8(a)(3) of the Act and that the stated reason for his discharge was pretextual. We cannot agree. The Board found significant the fact that Shook himself did not report the incident. We think that fact tends to prove that Shook's instructions were not intended to provoke Blessing, for had this been his purpose, surely Shook would have reported the outburst to his superiors. As we observed in NLRB v. McGahey, 233 F.2d 406, 412--13 (5th Cir. 1956):
 
 
 39
 'The Board's error is the frequent one in which the existence of the reasons stated by the employer as the basis for the discharge is evaluated in terms of its reasonableness. If the discharge was excessively harsh, if lesser forms of discipline would have been adequate, if the discharged employee was more, or just as, capable as the one left to do the job, or the like then, the argument runs, the employer must not actually have been motivated by managerial considerations, and (here a full 180 degree swing is made) the stated reason thus dissipated as pretense, nought remains but anti-union purpose as the explanation. But as we have so often said: management is for management. Neither Board nor Court can second-guess it or give it gentle guidance by over-the-shoulder supervision. Management can discharge for good cause, or bad cause, or no cause at all. It has, as the master of its own business affairs, complete freedom with but one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a)(3) forbids.
 
 
 40
 Blessing did not suffer discrimination because of any union activity. The mere fact that he had signed a union card afforded him no protection for his flagrant insubordination. Section 7 rights are a shield against employer retaliation, not a sword with which one may threaten or curse supervisors. Corriveau & Routher Cement Block, Inc. v. NLRB, 410 F.2d 347, 350 (1st Cir. 1969). Neither threats of violence nor insubordination constitute protected activities. Corriveau & Routher Cement Block, Inc. v. NLRB, supra; Boaz Spinning Co. v. NLRB, 395 F.2d 512 (5th Cir. 1968); NLRB v. Suniland Furniture Co., 387 F.2d 123 (5th Cir. 1967); NLRB v. R.C. Can Co., 340 F.2d 433 (5th Cir. 1965). We conclude that there is no evidentiary basis in the record for the finding that the discharge of Blessing was discriminatory and in violation of § 8(a)(3). His discharge was supported by good cause. Insofar as the Board's order requires reinstatement and back pay for Blessing, enforcement is denied.
 
 D. Discharge of James Sullivan
 
 41
 Crane operator James Sullivan joined the union as a volunteer organizer at the first meeting. Two days later his supervisor unlawfully interrogated him about his union activities. On May 21 he was given an unlawful reprimand for violating the Company's no-solicitation rule.
 
 
 42
 When Sullivan reported for work on the evening of July 22 he noticed that the 'traveling' air brakes on his crane were weak and not fully pressurized. He reported the problem to his foreman, who instructed Sullivan to contact the transportation mechanics. At about midnight Sullivan contacted the transportation foreman at home. He told the foreman about a problem he had been having with his hoist brakes, used for raising and lowering the electromagnet on the crane. By allowing extra room for stopping, Sullivan had been able to control the crane during the previous four hours, despite the problem with the traveling brakes. Consequently Sullivan did not bother to tell the foreman about the problem he had been having with the traveling brakes.
 
 
 43
 Late in his shift Sullivan had an accident. When he attempted to stop his crane, he found he had no brakes. He threw the engine into reverse, but was unable to prevent the crane from crashing into a pollution control device attached to a furnace. Had Sullivan checked the air pressure gauge at this time--he admittedly did not--he would have seen that the air pressure was insufficient to operate the brakes and could have taken other measures to stop the crane in time.
 
 
 44
 As a result of the accident, the furance had to be shut down for two hours while an emergency maintenance crew tied the duct to keep it from falling. The next day the furnace was shut down for over six hours while a twenty-foot section of pipe was replaced. These operations had held up production of over 100 tons of steel.
 
 
 45
 Upon a review of Sullivan's file, general foreman Hastings and melt shop superintendent Weidman determined to terminate him. A review of his personnel file revealed that Sullivan had violated discilinary rules on two occasions in October 1972, six months before the union campaign commenced. First, he received a written reprimand for unexcused absence or tardiness 'on many occasions.' On the second occasion he was given a second written reprimand and a one-day suspension for 'failure to report off.' At the same time he had been given a 'Final Warning' that future offenses of like seriousness would result in discharge. In addition, the file revealed that on May 21 Sullivan had been given a reprimand for violating the Company's no-solicitation rule; we have already held that this reprimand violated § 8(a)(3).
 
 
 46
 Sullivan testified that he was told that he had been discharged because he had broken a Company rule and damaged Company property. The Company admitted that Sullivan's prior reprimands--including the unlawful reprimand for solicitation--had a bearing on the decision to fire Sullivan, but general foreman Hastings testified that the main reason for the discharge was Sullivan's negligence and the damage to Company property resulting therefrom. Both the Administrative Law Judge and the Board found that Sullivan had not been discharged in violation of § 8(a)(3). We are not disposed to disturb that conclusion.
 
 
 47
 The union does not even dispute that Sullivan was negligent; instead it argues that Sullivan's discharge was violative of § 8(a)(3) because it was based in part on the unlawful reprimand which Sullivan had received for violation of the no-solicitation rule. This alone, however, simply does not establish that Sullivan's discharge was discriminatorily motivated. Sullivan was responsible for a serious accident; his work record was far from unblemished. The union failed to establish that Sullivan would not have been discharged but for the antiunion animus of the employer, Sweeney & Co. v. NLRB, 437 F.2d 1127, 1133 (5th Cir. 1971); NLRB v. Whitfield Pickle Co., supra. 'If, however, the misdeeds of the employee are so flagrant that he would almost certainly be fired anyway there is no room for discrimination to play a part.' Frosty Morn Meats, Inc. v. NLRB, 296 F.2d 617, 620--21 (5th Cir. 1961).
 
 
 48
 Enforcement granted in part and denied in part.
 
 
 
 [1]
 Section 8(a)(1), 29 U.S.C. § 158(a)(1) provides:
 It shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 (Section 7) of this title.
 Section 7, 29 U.S.C. § 157 provides:
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . ..
 
 
 [2]
 United Steelworkers of America, AFL-CIO
 
 
 [3]
 Section 8(a)(3), 29 U.S.C. § 158(a)(3) provides:
 It shall be an unfair labor practice for an employer by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.
 
 
 [4]
 The Company has petitioned this court to review and set aside the Board's order in No. 74--3983; the Board has cross-applied for enforcement, and the union has intervened in support of the Board. In No. 74--4201, the union has petitioned for review of the same order insofar as that decision failed to hold that Sullivan's discharge was violative of the Act
 
 
 [5]
 Purscell and some fellow employees had chosen to disclose their union involvement in hopes of avoiding the problem employee Cone had faced. Cone had been fired on May 11. The union filed an unfair labor practice with respect to Cone, alleging that he was discharged because of his union activities. At the subsequent Board hearing, however, Cone had been unable to establish that the Company had knowledge of his union involvement. Knowledge of a dischargee's union membership is a prerequisite to a finding that the discharge was made for that reason. NLRB v. Lexington Chair Co., 361 F.2d 283, 291 (4th Cir. 1966)